[No. 27947.   Department Two.   August 20, 1940.]

WILLIAM C. PEDDICORD, *Respondent,* v. DR. HERBERT LIESER, *Appellant.*[1]

[1]Reported in 105 P. (2d) 5.

*McMullen & Snider* (*Senn & Recken,* of counsel), for appellant.

*Louis Schaefer* (*Wm. P. Lord* and *T. Walter Gillard,* of counsel), for respondent.

STEINERT, J.—Plaintiff brought suit to recover damages for alleged malpractice by a physician and surgeon. The complaint alleged that, as a result of the explosion of a household refrigerator, certain chemicals and gases known as sulphur dioxide were discharged against the body and into the eyes of plaintiff; and that, in the emergency thus created, defendant was called to treat plaintiff's injuries. The charges

of negligence against defendant, as alleged in the complaint, were: (1) Failure to make a proper and careful diagnosis of plaintiff's condition; (2) failure to use reasonable skill and care in treating plaintiff, particularly in failing to take immediate steps to counteract the effect of the chemicals and gases; (3) failure to apply palliatives to relieve plaintiff's pain and suffering; and (4) abandoning plaintiff at a time when he was in need of further care and attention. The complaint further alleged that, as a direct and proximate result of defendant's negligence, plaintiff not only suffered excruciating pain, but also became totally and permanently blind. The allegations of negligence were denied by defendant.

Trial was had before a jury; and at the conclusion of the evidence, the trial court denied defendant's motion for a directed verdict, but granted his motion to withdraw from the jury the issue of defendant's negligence as a contributing cause of plaintiff's blindness. The case was then submitted to the jury solely upon the issues of defendant's negligence as a proximate, or contributing, cause of plaintiff's pain and suffering, and of the amount of damages thereby sustained. The jury returned a verdict for plaintiff in the amount of $6,500. On defendant's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, the court entered an order granting a new trial unless plaintiff should consent to a reduction of the verdict to $4,000. Plaintiff filed his consent to such reduction, and a judgment in the reduced amount was thereupon entered. From that judgment, defendant appealed, and, according to the respective briefs, plaintiff cross-appealed. We shall hereinafter refer to defendant as appellant, and to plaintiff as respondent.

Appellant has filed in this court a motion to dismiss

respondent's cross-appeal on the ground that certain legal requirements have not been met.

The judgment was entered on November 21, 1939. According to appellant's brief in support of his motion, the only notice of cross-appeal served upon appellant was a notice served December 20, 1939, to the effect that respondent appealed from the order made by the court, during the course of the trial, withdrawing from the jury the question of damages for loss of eyesight. Respondent has filed no brief in opposition to the motion, and has not otherwise advised us regarding the steps taken by him in perfecting a cross-appeal. Assuming that the order in question was an appealable one, we are, nevertheless, governed by, and can look only to, the record before us in determining whether or not a cross-appeal was properly taken and perfected by respondent.

The transcript of the proceedings, filed in this court, does not disclose that respondent ever served or filed any notice of cross-appeal, as required by Rule V, Rules of the Supreme Court (193 Wash. 4-a), and Rem. Rev. Stat., § 1719 [P. C. § 7293], or ever filed an appeal bond, as required by Rules V and VI, and Rem. Rev. Stat., §§ 1721 and 1722 [P. C. §§ 7295, 7296].

The giving of a notice of appeal, or cross-appeal, as required by Rule V and Rem. Rev. Stat., § 1719, is jurisdictional. *Metropolitan Club v. Massachusetts Bonding & Ins. Co.,* 127 Wash. 320, 220 Pac. 818; *Franklin v. Knox,* 157 Wash. 349, 288 Pac. 924; *Hibbard & Co. v. Morton,* 184 Wash. 569, 52 P. (2d) 313; *Hart v. Crowell,* 198 Wash. 77, 87 P. (2d) 105; *Isom v. Olympia Oil & Wood Products Co.,* 200 Wash. 642, 94 P. (2d) 482.

Likewise, the filing of a bond on appeal, as required by Rules V and VI, and Rem. Rev. Stat., §§ 1721 and

1722, is jurisdictional. *Hart v. Crowell,* 198 Wash. 77, 87 P. (2d) 105; *Public Utility Dist. No. 1 v. Girard,* 198 Wash. 149, 87 P. (2d) 287.

Since respondent did not comply with those jurisdictional requirements, his cross-appeal, if any there was, must be dismissed.

■ However, despite his failure to perfect a cross-appeal, respondent contends in his brief that the damages awarded by the jury for pain and suffering only, which was the sole issue submitted by the trial court to the jury, were not excessive, and that therefore the verdict should be reinstated. The presentation of that question upon the appeal perfected by appellant did not require the formality of a cross-appeal by respondent. Rem. Rev. Stat. (Sup.), § 399-1 [P. C. § 8225-1], provides:

"If the trial court shall, upon a motion for new trial, find the damages awarded by a jury to be so excessive or inadequate as unmistakably to indicate that the amount thereof must have been the result of passion or prejudice, the trial court may order a new trial or may enter an order providing for a new trial unless the party adversely affected shall consent to a reduction or increase of such verdict, and if such party shall file such consent and the opposite party shall thereafter appeal from the judgment entered, the party who shall have filed such consent shall not be bound thereby, but upon such appeal the supreme court shall, without the necessity of a formal cross-appeal, review de novo the action of the trial court in requiring such reduction or increase, and there shall be a presumption that the amount of damages awarded by the verdict of the jury was correct and such amount shall prevail, unless the supreme court shall find from the record that the damages awarded in such verdict by the jury were so excessive or so inadequate as unmistakably to indicate that the amount of the verdict must have been the result of passion or prejudice." Laws of 1933, p. 482, § 2.

Under the mandate of that statute, this court would be required to review the order reducing the amount of the verdict were it not for the fact that our decision on a controlling issue herein eliminates all questions relative to the amount of the damages. For that reason only, we forego consideration and determination of the justice or validity of the order reducing the amount of the verdict.

The primary question in this case is whether or not respondent's pain and suffering were, either wholly or in part, proximately caused by negligence on the part of appellant. A proper consideration of that question requires, of course, a knowledge of the underlying factual situation.

Respondent, nineteen years of age, was living in a house located on the United States Army reservation at Vancouver, Washington, where his father was a civilian employee. At about eleven o'clock in the morning of the day of the accident, respondent, who was then alone in the house, was endeavoring to repair a defective electric refrigerator, in which the chemical used as a refrigerant was sulphur dioxide. Respondent had only a slight knowledge of how the refrigerator operated, and no knowledge of the kind of refrigerant contained therein. In the course of his efforts to make the repair, he shook the refrigerator, and then, by means of a screwdriver, "removed the plate on the front of the machine where the ice cubes were and began to shake it some more." An explosion followed, as the result of which, according to respondent's testimony, the refrigerant was ejected with great force against his body in the region of the stomach. Covering his eyes with his hands, respondent immediately ran outdoors. In the front yard, he met his younger step-brother, of whom he requested that a doctor be summoned at once.

The family physician was called by telephone, but he, being unable to come, suggested the name of appellant, who was a physician and surgeon engaged in general practice. Appellant, in response to a telephone call, went immediately to respondent's home, arriving there within five or ten minutes, or about fifteen minutes after the accident had occurred. In the meantime, the step-brother had, at respondent's request, procured a pan of water and a cloth, and with these respondent fashioned a wet compress, and applied it over his eyes. On arrival of appellant, respondent was on his hands and knees, holding the wet bandage in place.

Respondent's testimony as to what occurred during the doctor's visit was as follows:

"He [the doctor] inquired as to what had happened, and, the best I could I explained that the refrigerator had blown up, and that I believed that it contained ammonia, and asked him what I should do. He informed me that I should stay outside in the fresh air and sunlight for a couple of hours and I would be all right, as good as I ever was; that I was getting my desserts for monkeying around that refrigerator. . . . He left [the doctor had gone into the house to examine the refrigerator] and then he soon returned and informed me that he didn't think it was ammonia in the refrigerator, that he thought it was some other type of gas which he didn't express the name of, didn't seem to know exactly what. I asked him then if he would not look at my eyes, and he made the remark that, what did he want to look at them for? He had seen hundreds of cases just like it and knew what they looked like and that if I would just do as he told me, stay outside in the fresh air and sunlight for a couple of hours I would be all right, that it was just like a smoke burn, and with that I never heard him again."

Respondent's testimony was corroborated by two witnesses, the step-brother and a neighbor who had appeared at the scene just shortly before the arrival of the doctor. The step-brother, however, also testified

that the doctor's statement that "you are getting just what you deserve for fooling around" was in response to the information imparted to him by respondent and the witness, to the effect that respondent "was fooling with the refrigerator and it blew up." When asked whether the doctor was joking or was serious in making the statement attributed to him, the witness said: "From those words, I believe that he was just kind of joking about it."

The doctor testified that, upon his arrival at the place, and after inquiring as to the cause of the accident, he made a partial examination of respondent's eyes, but was unable to make a thorough examination because to do so would have required certain instruments which he did not have.

During the time that the doctor was present, a period of ten or fifteen minutes, respondent made no complaint of pain, and, according to his own testimony, did not, during that period, experience any noticeable pain or discomfort other than a headache and a cough. It is conceded that the doctor did not irrigate respondent's eyes, nor administer any other remedy or palliative to him.

Shortly after the doctor had departed, respondent, who was then alone, began to experience pain in his eyes, and difficulty in breathing. He thereupon went into the house unattended and telephoned to the army hospital for an ambulance. Within fifteen or twenty minutes, the ambulance arrived, and respondent was taken to the hospital, where he was given immediate care. During the next twenty-four hours, fluids of one kind or another were constantly injected into his eyes; no opiates, however, were administered. When respondent left the hospital, the next day, he was unable to see anything, and from that time to the present has been totally blind.

This action was subsequently brought to recover damages for loss of eyesight, and for the pain and suffering attendant upon the injury. The issue of loss of sight has already been disposed of by the dismissal of respondent's cross-appeal, leaving only the cause of action for pain and suffering. The record and the briefs, however, have so interwoven the two causes of action that, for convenience and clarity, the case will be treated as though both issues were still before us on the merits.

The mere fact that respondent sustained injury or suffered pain as the result of the accident is, of course, insufficient in itself to impose liability upon appellant. Respondent is entitled to recover for such injury or suffering only as can be said to have been the proximate result of negligence on the part of appellant. *Taylor v. Kidd,* 72 Wash. 18, 129 Pac. 406; *Cranford v. O'Shea,* 83 Wash. 508, 145 Pac. 579, Ann. Cas. 1916C, 1081; *Griffis v. Brown,* 149 Wash. 203, 270 Pac. 819; *McCormick v. Jones,* 152 Wash. 508, 278 Pac. 181, 65 A. L. R. 1019.

The successive elements of negligence now relied upon by respondent are: (1) Failure to examine respondent's eyes; (2) failure to irrigate them with water; and (3) failure to remain in attendance upon respondent until he was taken to a hospital. It will be assumed for the purposes of this opinion that appellant failed to do any of those things. These allegations of negligence, of course, imply correlative duties.

Of the duties thus implied, the first was but a means of determining the necessity or advisability of performing the second; and the third simply involved the element of time during which the first and second implied duties might have been performed. The whole case, as presented to us, therefore turns upon the question of whether or not appellant was negligent in fail-

ing to apply water to respondent's eyes in an attempt to eliminate, or at least to dilute, the sulphurous acid; or, in other words, whether or not the failure to irrigate respondent's eyes with water constituted a breach of appellant's duty to exercise reasonable care and skill.

It is well settled that a physician is liable for a wrong diagnosis resulting from a want of skill or care on his part, *if* such diagnosis is followed by improper treatment, to the injury of the patient. But unless improper treatment does follow, a wrong diagnosis gives no right of action. *Just v. Littlefield,* 87 Wash. 299, 151 Pac. 780, Ann. Cas. 1917D, 705; *Dishman v. Northern Pac. Beneficial Ass'n,* 96 Wash. 182, 164 Pac. 943.

If, in this instance, the alleged failure to make an examination of respondent's eyes be considered as a failure to make any diagnosis at all, it still would not afford a right of action unless the treatment which followed was improper. An essential element of the right of action is improper treatment.

It is respondent's contention that the situation presented by the evidence before us was of the kind in which a jury may infer negligence from the facts alone, without resort to expert testimony. With that contention we cannot agree. The effect of sulphurous acid upon the eyes, the selection and application of the proper neutralizing agent for that chemical, and the effect of water upon such chemical, were clearly, in our opinion, matters beyond the knowledge possessed by laymen, and called for testimony by expert witnesses.

Whenever an issue involves a certain state of facts, a proper understanding of which requires knowledge or experience beyond that gained in the ordinary affairs of life, resort must be had to expert testimony

in order to arrive at an intelligent conclusion. *Brear v. Sweet,* 155 Wash. 474, 284 Pac. 803; 20 Am. Jur. 647, § 775.

There was in this case a great deal of expert testimony. In fact, practically all of the evidence, except that which related to the occurrence of the accident, and to the things actually done by the doctor, was directed to the question of the nature and effect of sulphurous acid. That evidence was supplied by the testimony of medical witnesses, of whom one was called by respondent and three by appellant.

All of the experts agreed that sulphur dioxide forms sulphurous acid upon coming in contact with moisture; that such formation begins almost instantaneously; and that sulphurous acid is very destructive in nature. The experts also all agreed that cases of sulphurous acid burns of the eye are extremely rare. The evidence in the case shows clearly that the ejected refrigerant struck respondent directly in the eyes, although he denied that such was the fact. Gas fumes alone would have caused irritation only, and would have been neutralized by the flow of tears occasioned by the irritant. To produce destruction of eyesight, a strong concentration of acid sufficient to penetrate the membrane of the eyes is necessary.

Respondent's expert witness, a practicing physician and surgeon, testified, in response to hypothetical questions, that sulphur dioxide gas coming in contact with the moist surfaces of the eyes, throat, or lungs would form hydro-sulphurous acid and produce chemical burns; that over ninety per cent of the people, including doctors, do not know what the chemical in a refrigerator is, but that most people do know that ammonia is used for refrigeration; that, if ammonia were ruled out of consideration, the "average doctor" would probably not know with what particular gas he was

dealing; that, under such circumstances, the reasonable and prudent thing to do would be to endeavor to find out what kind of gas it was, although that might take considerable time; that, in an emergency, the sensible thing to do would be to "throw water" in the patient's face, assuming that the water was clean; that the addition of salt or bicarbonate of soda to the water would be advisable; that the object of using water would be to remove or dilute any fluid or gaseous irritant; and that, aside from the use of water, under the circumstances here present, there was nothing that should have been done. However, when asked as to how long it would take sulphurous acid to exhaust its destructive effect upon the eyes, the doctor said: "I would not venture a guess, because I do not know."

The witness was specifically asked the question:

"Had the water been used immediately when the doctor arrived, or within a short time after that, at least within the ten minutes during which he was present, to this boy's eyes, what effect would that have had on the resulting vision of his eyes, or the vision of his eyes?"

That question, although it went to the crux of the matter as the case stood at that time, was never directly answered, nor did the witness at any time testify that, had the doctor immediately applied water to respondent's eyes, his vision would have been saved, either wholly or in part. The extent to which the witness was willing to commit himself was that he thought that if the doctor, within ten or fifteen minutes after his arrival, had irrigated respondent's eyes with a solution of bicarbonate of soda the pain would probably have been lessened. It will be recalled, however, that, during the period of the doctor's presence, respondent made no complaint of pain. It will also be recalled that, prior to the doctor's arrival, and during

the period of his presence, respondent held a saturated bandage over his eyes. There is nothing in the record to warrant a finding that the situation as then presented called for the administration of a further palliative simply for the alleviation of existing pain.

With respect to the advisability of "throwing" or injecting water into respondent's eyes, under the circumstances, appellant's evidence refuted that of respondent's medical expert. Appellant himself testified:

"I would say it would be a most risky thing, to put anything into that eye. There is a great deal of danger about throwing this, that or the other thing into the eyes, especially eyes that are damaged. It would be questionable whether you could do any good and a lot of chance that you could do a lot of harm."

Testifying for appellant were three physicians, one of whom was an associate professor of medicine and head of experimental medicine at the University of Oregon medical school, whose work had included a study of the effects of poison gases on the body, and the other two of whom limited their practice to eye, ear, nose, and throat work. All three of these witnesses testified that sulphurous acid accomplishes its destructive work in such a very short time that there was nothing that appellant could have done, upon his arrival, which would have saved respondent's sight.

As to the advisability of washing the injured eyes with water, the physician and associate professor testified:

"It is open to serious question whether it would be advisable to put water in there, because water is not a physiological solution. That is, water is what we call hypotonic. It does not contain the same salt content as the body tissues, and water in contact with such a delicate membrane as the eye would tend to cause further swelling, and this continues, and unless the water was boiled and handled in a sterile syringe or with sterile equipment it might introduce bacteria

which would still further damage the already damaged structure. That is, you can put water into the un-damaged eye and not run any great risk of damaging it, but if the surface of the cornea is already damaged there is great danger of producing infection if one introduces a solution that is not sterile, that is, is not free of living bacteria, and all ordinary water sup-plies contain bacteria."

The other two witnesses, eye specialists, testified to the same effect, although one of them conceded that he would have washed the eyes with ordinary water if nothing else were available, on the theory that "des-perate conditions sometimes require desperate rem-edies." His positive testimony, however, was that damage to the eyes from sulphurous acid is almost in-stantaneous, a matter of seconds rather than minutes, and that "within a period of a moment or two there would be practically no hope of retention of vision or restoration of vision."

We have repeatedly and uniformly held that where physicians and surgeons of equal skill and learn-ing, being in no way impeached or discredited, disagree in their opinions as to what the proper treatment should be, the jury will not be allowed to accept one theory to the exclusion of another, and consequently there is nothing upon which a verdict by a jury can be based. *Dahl v. Wagner*, 87 Wash. 492, 151 Pac. 1079; *Ennis v. Banks*, 95 Wash. 513, 164 Pac. 58; *Dish-man v. Northern Pac. Beneficial Ass'n*, 96 Wash. 182, 164 Pac. 943; *Miles v. Hoffman*, 127 Wash. 653, 221 Pac. 316; *Howatt v. Cartwright*, 128 Wash. 343, 222 Pac. 496; *Corey v. Radabaugh*, 143 Wash. 653, 255 Pac. 1037; *Hall v. Partlow*, 168 Wash. 289, 11 P. (2d) 819.

The fact that appellant was not, at the time, aware of the nature or effect of the particular chemical refrigerant is immaterial, in view of the evidence con-cerning the proper treatment of eyes damaged by such

chemical. He cannot be held liable for failure to treat an unknown condition in a particular way, when, had he been fully advised concerning that condition, he would, nevertheless, have refrained from administering that same treatment.

Viewing all the testimony in this case as a whole, the most that can be said on respondent's behalf is that there is a serious disagreement among qualified experts as to the advisability of putting water on eyes damaged by sulphurous acid. Under such circumstances, appellant cannot be held guilty of malpractice because he did not pursue that course of treatment. In that respect, the cause of action for loss of eyesight and the cause of action for pain and suffering stand upon the same footing.

The judgment is reversed, with direction to dismiss the action.

BLAKE, C. J., BEALS, MILLARD, and DRIVER, JJ., concur.