

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JAN 1 0 2019
[signature]
CHIEF JUSTICE

This opinion was filed for record

at __8 a.m.__ on __Jan 10, 2019__

[signature]
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 95551-4 |
| | ) | (consol w/95571-9) |
| Petitioner, | ) | |
| v. | ) | |
| | ) | En Banc |
| JENNIFER CATHRYN DREEWES | ) | |
| | ) | |
| Respondent. | ) | Filed ___JAN 1 0 2019___ |

MADSEN, J.—This case concerns the interplay of the law of the case doctrine and accomplice liability: specifically, whether the State's assumption of the burden to prove an element added to the "to convict" instruction for second degree assault also altered the State's burden of proof as to accomplice liability. Under the circumstances of this case, we hold that the Court of Appeals improperly applied the State's assumed burden under the law of the case context to the State's burden to prove accomplice liability, we reverse the Court of Appeals and reinstate defendant's conviction for accomplice to second degree assault.

This case also concerns whether the Court of Appeals properly denied defendant's motion to seal portions of the State's response brief and defendant's reply brief that

contained information about defendant's financial matters. We affirm the Court of Appeals on this issue.

## FACTS

Jennifer Dreewes was the victim of property theft when a laptop, an iPhone, checks, credit cards, and other items were stolen from her truck. She reported the theft to law enforcement. After one of her credit cards was used at a store, Dreewes contacted the store to get a description of the person who had used her card. A store employee described the person as a skinny white girl with pink hair and a black eye. Dreewes contacted the detective working on her case to give him the description and also informed him that she had put the information on Facebook and communicated it through her nephew and his friends to see if anyone knew the pink-haired girl.

Michelle Thomas, a high school friend, responded to Dreewes's Facebook post and told Dreewes that her boyfriend, Don Parrish, knew a lot of people and could help identify the girl. Thomas later informed Dreewes that she had obtained several photographs of the pink-haired girl and that her name was Ness. Dreewes provided the information to the detective working her case and told the detective that Ness was staying at 10501 56th Drive Northeast in Marysville. Dreewes also provided the detective with a license plate of a sport utility vehicle (SUV) parked in the driveway and a phone number for Ness. Dreewes informed the detective that a friend of her nephew had seen Dreewes's belongings at the house in Marysville.

The detective identified Ness as Vanessa Miller and the registered owner of the license plate for the SUV as Marty Brewer-Slater. The detective was not able to find a

link between Vanessa Miller and Marty Brewer-Slater. He called the telephone number for Ness and left a voice mail message asking her to contact the police.

Meanwhile, Dreewes and Thomas exchanged over 170 Facebook messages about retrieving Dreewes's stolen property and bringing the pink-haired girl to Dreewes so she could harm her. Dreewes said she would pay Thomas and Parrish $300 to track down the girl with pink hair. Dreewes later sent Thomas a Facebook message confirming that her stolen property was in the Marysville house. Thomas asked Dreewes to clarify exactly what she wanted Thomas and Parrish to do. Dreewes responded that she wanted her property and wanted Ness to have two black eyes and to go to jail. Dreewes told Thomas to grab Ness and bring her to Dreewes's barn in Arlington. Thomas asked Dreewes how many people and weapons were in the Marysville house. Dreewes told Thomas that her nephew said there would be four to five people in the house and to not go unless they were "packing." 2 Report of Proceeding (RP) 313-14, 335; Ex. 52, at 3810. In addition to the Facebook messages, Dreewes and Thomas also talked on the phone and exchanged several text messages.

Thomas later sent Dreewes a Facebook message informing Dreewes that she and Parrish had gone to the house in Marysville and that no one had answered the door, but that they would return to the house later that day. When Thomas and Parrish returned, Marty and her husband, Rohen Brewer-Slater, who resided in the house, were home, along with Eenone Johnson-McDonell and James Meline. Parrish carried a semiautomatic rifle under his coat, and Thomas carried a pistol and had duct tape and zip ties in her backpack.

Parrish and Thomas forcefully entered the Brewer-Slater home. Thomas and Parrish pointed their guns at Rohen, demanded all of the computers and laptops in the home, and said that if Rohen did not do what they asked they would kill him. Rohen yelled for someone to call 911. Johnson-McDonell and Meline heard the shouting. Meline ran upstairs from the basement, and Thomas pointed her gun at Rohen and Meline. Parrish went downstairs, pointed his rifle at Johnson-McDonell, and told her to give him her phone. Meanwhile, Marty ran down from the upstairs bedroom carrying bear mace. Rohen grabbed Thomas's pistol and threw it into the fireplace in the next room, and Thomas ran out the front door. Parrish hit Rohen in the face with the butt of his rifle and then aimed his rifle at Marty and pulled the trigger, but the gun did not fire because the safety was on. Marty sprayed Parrish in the face with the bear mace. Rohen, Johnson-McDonell, and Meline tried to wrestle the rifle away from Parrish, who dropped the rifle and ran. Rohen chased and caught Parrish, and Rohen and Meline held him until the police arrived.

Immediately after the incident, Thomas called Dreewes and told her that everything had gone wrong, summarizing what had happened. Dreewes told Thomas to go to Dreewes's mother's home and wait for her, and to delete all of their communications from her phone. Instead, Thomas contacted law enforcement. Law enforcement officers interviewed Thomas and Parrish and obtained a search warrant for Thomas's cell phone records. During a police interview, Dreewes stated that she had deleted all text messages with Thomas, but she admitted that most of their communication was on Facebook. Responding to a law enforcement warrant, Facebook

4

produced a 25-page printout of the messages that occurred between Thomas and Dreewes in the days leading up to and including the incident in the Brewer-Slater home.

The State charged Dreewes as an accomplice to first degree burglary and second degree assault with a deadly weapon of Marty. Parrish and Thomas were identified as codefendants. A number of witnesses testified at trial, and the court admitted over 60 exhibits into evidence, including Facebook and phone records. Exhibit 52 contained the Facebook communications between Dreewes and Thomas with data fields identifying the date and time sent, recipients, and author. Cell phone records showed that Dreewes and Thomas exchanged 183 cell phone calls and text messages, and that approximately an hour before Thomas and Parrish entered the Brewer-Slater home, Thomas called Dreewes and Dreewes later sent Thomas a text message.

The trial court instructed the jury that Dreewes was guilty as an accomplice and legally accountable for the conduct of another person in the commission of the crime if, with knowledge, she solicited, promoted, or facilitated the commission of the crime. Clerk's Papers (CP) at 30. The court also instructed the jury that to convict the defendant of the crime of assault in the second degree as charged it must be proved beyond a reasonable doubt that on or about January 23, 2014, the defendant assaulted Marty with a deadly weapon, and that this act occurred in the state of Washington. *Id.* at 27.

The jury found Dreewes guilty as an accomplice to first degree burglary and as an accomplice to second degree assault of Marty. By special verdict, the jury found Dreewes was armed with a firearm.

5

Dreewes appealed, and in a partially published opinion, the Court of Appeals affirmed her conviction as an accomplice to first degree burglary but reversed her conviction as an accomplice to second degree assault. *State v. Dreewes*, 2 Wn. App. 2d 297, 300, 409 P.3d 1170 (2018). Dreewes also moved in the Court of Appeals to seal pages 22 to 24 of the State's response brief and section 5 of her reply brief, which discussed her financial situation with respect to the State's contemplated request for appellate costs in the event the judgment and sentence was affirmed. The State filed a supplemental designation of clerk's papers, designating Dreewes's declaration from her unrelated dissolution action, on which the financial information in the State's response was based. In her reply brief, Dreewes filed section 5 of her reply under seal. A commissioner of the Court of Appeals denied Dreewes's motion to seal, indicating Dreewes could renew her motion to seal if the underlying documents were sealed in her dissolution proceedings. The commissioner also struck the State's supplemental designation of clerk's papers. Thereafter, the superior court sealed the financial declarations in Dreewes's dissolution proceeding. Dreewes again moved to seal pages 22 to 24 of the State's response brief and section 5 of her reply brief. The clerk of the Court of Appeals denied Dreewes's motion because pages 22 to 24 of the State's brief and section 5 of her reply brief did not include any financial account numbers or other personal identification numbers. Dreewes moved to modify the clerk's ruling, but a panel of the Court of Appeals denied the motion.

The State sought this court's review of the Court of Appeals' decision reversing the second degree assault conviction. Dreewes filed an answer opposing review of the

State's issue and asking the court to review other portions of the Court of Appeals' decision. Dreewes additionally filed a motion for discretionary review of the Court of Appeals' decision denying her motion to seal, which the commissioner referred to a department of this court to be considered with the petitions for review. This court granted the State's petition for review, denied review of Dreewes's issues asserted in her answer, and granted review of Dreewes's motion for discretionary review regarding the denial of her motion to seal. *State v. Dreewes*, 190 Wn.2d 1019 (2018).

## ANALYSIS

### Standard of Review

Appellate courts review jury instructions, statutory interpretation, and other questions of law de novo. *See State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006); *Cox v. Spangler*, 141 Wn.2d 431, 442, 5 P.3d 1265 (2000); *Ed Nowogroski Ins. v. Rucker*, 137 Wn.2d 427, 436-37, 971 P.2d 936 (1999).

### Second Degree Assault, Law of the Case, Accomplice Liability, and Sufficiency

The State contends that the Court of Appeals erred in reversing Dreewes's conviction for second degree assault based on accomplice liability. We agree.

In the Court of Appeals, Dreewes argued that the evidence was not sufficient to support finding her guilty as an accomplice because she had no knowledge that Thomas and Parrish would commit the crime of assault in the second degree of Marty with a deadly weapon. Dreewes's argument, however, improperly conflated this court's law of the case doctrine with the requirements of accomplice liability.

Here, the "to convict" instruction on the second degree assault charge stated, in part:

> To convict the defendant of the crime of assault in the second degree as charged in Count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
> *(1) That on or about the 23rd day of January, 2014, the defendant assaulted Marty[ ] Brewer Slater with a deadly weapon.*

CP at 27 (Instr. 15) (emphasis added). The instructions also defined "assault" as follows:

> An assault is an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.
> An assault is also an act done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

*Id.* at 28 (Instr. 16). There is no dispute that the above "to convict" instruction included as an element the victim's name, "Marty[] Brewer Slater."[1]

"[O]ur 'law of the case' doctrine . . . requires the State to prove every element in the to-convict instruction beyond a reasonable doubt." *State v. Johnson*, 188 Wn.2d 742, 762, 399 P.3d 507 (2017). The law of the case is "an established doctrine with roots reaching back to the earliest days of statehood." *State v. Hickman*, 135 Wn.2d 97, 101, 954 P.2d 900 (1998). "Under the doctrine jury instructions not objected to become the law of the case." *Id.* at 102. "In criminal cases, the State assumes the burden of proving

---

[1] In most cases, use of the victim's name in the elements instruction helps ensure that the jury decides whether the defendant is guilty of the exact crime charged—the crime against a particular, named individual. In fact, the Washington Pattern Instructions Committee's pattern instructions provide a blank for the victim's name to achieve that goal. *See, e.g.,* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 35.19, at 509 (4th ed. 2016) (the second degree assault instruction given in this case).

otherwise unnecessary elements of the offense when such added elements are included without objection in the 'to convict' instruction." *Id.*

The State concedes that under the law of the case doctrine, it assumed the burden to prove the additional element, arguing that it did so. Indeed, there is ample evidence in the record that a coparticipant forced his way into the residence and, as Marty descended the stairs, he pointed a firearm at her and pulled the trigger several times. The attempts to shoot Marty were thwarted only because the gun's safety was on.

When addressing a claim of insufficient evidence, a reviewing court considers "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Johnson*, 188 Wn.2d at 762 (internal quotation marks omitted) (quoting *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (plurality opinion)). "'When the sufficiency of the evidence is challenged in a criminal case, all reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant.'" *Id.* (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). Here, a jury could rationally conclude that a coparticipant assaulted Marty with a firearm.

Regarding accomplice liability, the jury was instructed as follows:

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or
(2) aids or agrees to aid another person in planning or committing the crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

A person who is an accomplice in the commission of a crime is guilty of that crime whether present at the scene or not.

CP at 30 (Instr. 18). This instruction tracks the language of the accomplice liability

statute, which provides in relevant part:

A person is an accomplice . . . in the commission of a crime if:
(a) With knowledge that it will promote or facilitate the commission of the crime, he or she:
(i) Solicits, commands, encourages, or requests such other person to commit it; or
(ii) Aids or agrees to aid such other person in planning or committing it.

RCW 9A.08.020(3).

Here, a jury could reasonably find that Dreewes both solicited and aided in the

home invasion and assault. She offered the coparticipants $300 to go to the identified

residence, retrieve her items, give the pink-haired girl two black eyes, and abduct her and

bring her to Dreewes's property. Dreewes told the coparticipants that four to five adults

were at the residence and they should go there armed. She talked with a coparticipant

just before and after the home invasion and afterward told a coparticipant where to go to

hide from police.[2] A jury could reasonably conclude that Dreewes both solicited the home invasion and aided in the events that occurred there.

In *State v. Roberts*, 142 Wn.2d 471, 510-13, 14 P.3d 713 (2000), this court reiterated "our long-standing rule that an accomplice need not have specific knowledge of *every element* of the crime committed by the principal, provided he has general knowledge of that specific crime." *See also State v. Hoffman*, 116 Wn.2d 51, 104, 804 P.2d 577 (1991) ("the accomplice liability statute predicates criminal liability on general knowledge of the crime and not on specific knowledge of the elements of the participant's crime"). In *State v. Rice*, 102 Wn.2d 120, 125, 683 P.2d 199 (1984), this court held, "[W]here criminal liability is predicated on the accomplice liability statute, the State is required to prove only the accomplice's *general knowledge of his coparticipant's substantive crime*. Specific knowledge of *the elements* of the coparticipant's crime need not be proved to convict one as an accomplice." (Emphasis added.)

Further, in *State v. Teal*, 152 Wn.2d 333, 338, 96 P.3d 974 (2004), this court held that "[a]lthough a 'to convict' instruction must provide a complete statement of the elements of the crime charged, accomplice liability is not an element of the crime for which [defendant] was charged, nor is accomplice liability an element of, or alternative means of, committing a crime." "The rule requiring that all elements of a crime be listed

---

[2] Dreewes communicated with Thomas via Facebook. When Thomas arrived at the house, she messaged Dreewes that there were "[m]ass people here in this neighborhood." Ex. 52, at 3814. Dreewes immediately messaged back, directing Thomas to "[n]ab her and run." *Id.*

in a single instruction is not violated when accomplice liability is described in a separate instruction." *Id.* at 339.

This court has also explained that in the context of premeditated first degree murder by accomplices, "the law of accomplice liability allows the jury to reach a conviction by splitting the elements of [the charged offense]." *State v. Walker*, 182 Wn.2d 463, 483, 341 P.3d 976 (2015). "A conviction based on split elements may be affirmed '[s]o long as the State proved beyond a reasonable doubt to the satisfaction of all of the jurors that at least one of the participants [had the requisite intent] and at least one but not necessarily that same participant [committed the criminal act].'" *Id.* (alterations in original) (quoting *State v. Haack*, 88 Wn. App. 423, 429, 958 P.2d 1001 (1997)). Similarly, here all that the State need prove for accomplice liability to attach is that a coparticipant assaulted Marty with a deadly weapon and that Dreewes solicited and "aided" in the assault. "[T]he accomplice liability statute predicates criminal liability on general knowledge of the crime and not on specific knowledge of the elements of the participant's crime." *Hoffman*, 116 Wn.2d at 104 (citing *State v. Davis*, 101 Wn.2d 654, 657-58, 682 P.2d 883 (1984); *State v. Carothers*, 84 Wn.2d 256, 261-62, 525 P.2d 731 (1974)). "Accomplice liability represents a legislative decision that one who participates in a crime is guilty as a principal, regardless of the degree of the participation." *Id.* "'The accomplice statute implicitly demonstrates that the State need not prove that the principal and accomplice share the same mental state.'" *State v. Guloy*, 104 Wn.2d 412, 431, 705 P.2d 1182 (1985) (quoting *State v. Bockman*, 37 Wn. App. 474, 491, 682 P.2d 925 (1984)).

In *State v. Trout*, 125 Wn. App. 403, 105 P.3d 69 (2005), Division Three of the Court of Appeals affirmed defendant's conviction for first degree robbery and second degree assault based on accomplice liability even though the object of the intended robbery and assault changed between the time it was planned and when it occurred (i.e., when the intended victim was not found in the apartment as expected, coparticipants robbed and attacked other occupants). As the Court of Appeals explained, defendant may not have actually physically stolen the property or actually physically harmed the victims, but he knew coparticipants were armed with weapons and he knew they were going to the victims' apartment to take property by force. The jury could and did find that defendant (who was present) promoted or facilitated the others in this robbery and assault. The evidence, considered in a light most favorably to the State, amply supported the jury's finding that defendant acted as an accomplice to charges of first degree robbery and second degree assault. *Id.* at 413. The same is true here. Dreewes knew the plan was to go to the victim's presumed residence, retrieve Dreewes's laptop and other property by force, and assault and kidnap the pink-haired girl. Dreewes encouraged her coparticipants to arm themselves and informed them that four to five adults were at the residence. Just before the home invasion, Dreewes directed Williams to "[n]ab her and run." Ex. 52, at 3814. While an accomplice must have actual knowledge that a principal was engaging in the crime eventually charged, "Washington's culpability statute provides that a person has actual knowledge when 'he or she has information which would lead a reasonable person in the same situation to believe' that he was promoting or facilitating the crime eventually charged." *State v. Allen*, 182 Wn.2d 364, 374, 341 P.3d 268 (2015)

13

(quoting RCW 9A.08.010(1)(b)(ii)). Again, a jury could reasonably conclude that Dreewes both solicited the home invasion and aided in the events that occurred there—including the assault on Marty. Dreewes did not need to know the names of all potential victims for accomplice liability to attach; it was enough that she had general knowledge of her coparticipant's substantive crime.

Here, the Court of Appeals, relying on *Hickman* and *Johnson*, ruled that the State had failed to establish that Dreewes knew that Marty was going to be assaulted. But *Hickman* and *Johnson* do not control here. Neither addressed (or even mentioned) accomplice liability. Those cases apply the law of the case doctrine, but not in the accomplice liability setting. As described above, both the law of the case doctrine and accomplice liability can be harmoniously applied here. A jury could reasonably find that the State met its burden under the second degree assault to convict instruction showing that a coparticipant assaulted Marty and that Dreewes solicited and aided in the burglary and assault as described in the accomplice instruction.

Motion To Seal

Dreewes primarily contends that under GR 15(g) and *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 640 P.2d 716 (1982), this court should seal those portions of the response and reply briefs that incorporate information from sealed superior court documents. Under the circumstances of this case, we disagree.

GR 15(g) provides,

> **Use of Sealed Records on Appeal**. A court record or any portion of it, sealed in the trial court shall be made available to the appellate court in the event of an appeal. *Court records sealed in the trial court shall be sealed*

14

>*from public access in the appellate court subject to further order of the appellate court.*

(Emphasis added.) Dreewes contends that this rule controls and, by its plain language, applies to any appellate proceeding. She cites no supporting authority. Further, a plain reading of the rule suggests it applies in an appeal of the same case, referring to "the trial court" and "the appellate court" rather than referring to a, an, or any trial or appellate court. *See id.*

But more to the point, this court has explained that even if the requirements of GR 15 are satisfied,[3] "a court considering whether to seal a court record also must determine whether the sealing would violate Washington Constitution article I, section 10. To make this determination, a court must analyze the five factors set forth in *Ishikawa.*" *In re Dependency of M.H.P.*, 184 Wn.2d 741, 765, 364 P.3d 94 (2015) (citing *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 209-11, 848 P.2d 1258 (1993)). The five *Ishikawa* factors are

> "1. The proponent of closure [and/]or sealing must make some showing of the need for doing so, and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.
> "2. Anyone present when the closure [and/or sealing] motion is made must be given an opportunity to object to the closure.
> "3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.
> "4. The court must weigh the competing interests of the proponent of closure and the public.

---

[3] GR 15 also contains subsection (c)(2), which authorizes a court to seal or redact court records and files where the court "makes and enters written findings that the specific sealing or redaction is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court record."

"5. The order must be no broader in its application or duration than necessary to serve its purpose."

*Id.* at 765-66 (alterations in original) (quoting *Eikenberry*, 121 Wn.2d at 210-11 (citing *Ishikawa*, 97 Wn.2d at 36-39)). Here, despite Dreewes's contrary assertions, the *Ishikawa* factors do not support the sealing she requests.

Concerning the first *Ishikawa* factor (serious and imminent threat), while Dreewes, like everyone else, has a personal interest in keeping her financial information private,[4] she does not show that the particular financial information that is contained in the portions of the briefs that she seeks to seal would result in a "serious and imminent threat" to her interest if such information remained in these public documents. Such a threat might be shown if the information at issue included personal identifiers, which could be used to facilitate identity theft.[5] But no such information is included in the passages at issue.

Regarding the second *Ishikawa* factor (opportunity to object), the State has consistently opposed Dreewes's motion to seal.

Concerning the third and fifth *Ishikawa* factors, Dreewes's proposed sealing must be the "least restrictive means available" to protect her asserted interest and "no broader than necessary" to effect that goal. But Dreewes motion sought to strike entire pages

---

[4] "'Personal financial information, such as one's income or bank account balance, is universally presumed to be private, not public.'" *M.H.P.*, 184 Wn.2d at 777 (Gordon McCloud, J., concurring) (quoting *In re Boston Herald, Inc.*, 321 F.3d 174, 190 (1st Cir. 2003)).

[5] Court rules expressly provide for the exclusion of "personal identifiers." *See* GR 31(e) ("parties shall not include [or] . . . shall redact, the following personal identifiers from all documents filed with the court," listing financial account numbers, Social Security number, and driver's license number).

from the respondent's brief and an entire section from her reply brief. The targeted passages contain legal argument as well as references to the financial information she finds offensive. Notably, Dreewes expressly argues for sealing rather than redaction even though GR 15(c)(3) provides that "[a] court record shall not be sealed . . . when redaction will adequately resolve the issues before the court."

As for the fourth *Ishikawa* factor (balancing competing interests), this court has recognized that "our state's constitution firmly establishes that the public has a fundamental interest in the open administration of justice. WASH. CONST. art. I, § 10," *M.H.P.*, 184 Wn.2d at 771, and also that "the expenditure of public funds" is of interest to both the State and the public. *Id.* Accordingly, as discussed, in light of the absence of any showing of serious and imminent threat by Dreewes, weighed against the public's fundamental interest in the open administration of justice and oversight of public fund use, the balance tips in favor of the public's stronger interest.

In her supplemental brief, Dreewes cites *Dreiling v. Jain*, 151 Wn.2d 900, 93 P.3d 861 (2004), and Division One's decision in *Hundtofte v. Encarnación*, 169 Wn. App. 498, 280 P.3d 513 (2012), *aff'd*, 181 Wn.2d 1, 330 P.3d 168 (2014), as support, but these cases do not assist her. In *Dreiling*, this court observed that "any material submitted to the trial court . . . is presumptively accessible to the public and may be sealed only in accordance with *Ishikawa*." 151 Wn.2d at 918. In *Hundtofte*, Divison One similarly observed, "'[I]n determining whether court records may be sealed from public disclosure, we start with the presumption of openness.'" 169 Wn. App. at 516 (quoting *Rufer v. Abbott Labs.*, 154 Wn.2d 530, 540, 114 P.3d 1182 (2005)).

17

In her response to amici,[6] Dreewes argues that the public's interest is minimal in this case because due to a court rule amendment, the issue of appellate costs has yet to be determined, so there is not yet any expenditure of public funds for the public to oversee.[7] But the absence of a cost award (thus far) does not diminish the public interest in the ultimate oversight of the appropriateness of public funding—including funding for Dreewes's appellate counsel. In any event, Dreewes's argument does not diminish the public's remaining fundamental interest in the open administration of justice under article I, section 10. *See M.H.P.*, 184 Wn.2d at 771.

Dreewes further contends that upon her release from incarceration, the presence of the financial information in the briefs could make her reentry into society more difficult because such information could affect her ability to obtain housing, employment, or a mortgage, and could affect her credit score and stigmatize her. But under the circumstances of this case, Dreewes's assertions do not convince us that sealing is warranted. Here, Dreewes raised the issue of whether the court rule imposing costs applied to her due to her claimed indigency, thus putting at issue her ability to pay costs and prompting the State's response addressing that issue. Further, her indigent status is already part of the open court record in this case.

---

[6]The brief of amici Allied Daily Newspapers of Washington and Washington Coalition for Open Government focused in part on the public's interest in overseeing courts.

[7] In the course of this case, the court rule addressing appellate costs, RAP 14.2, was amended to permit the commissioner or clerk the discretion to determine an adult offender's "current or likely future ability to pay" when determining an award of appellate costs to the substantially prevailing party.

Finally, under revised court rule RAP 14.2, in deciding appellate costs, the commissioner or clerk "may consider any evidence offered to determine the individual's current or future ability to pay." Under the circumstances of this case, Dreewes has not convincingly argued that sealing is warranted.

Motion Passed to the Merits

In this court, Dreewes has also recently filed a "Motion To Seal Limited Portions of Answer to Amici If Court Seals Corresponding Briefing," which was passed to the merits. There, she asked that this court "seal five sentences from her Answer to Brief of Amici Curiae *if*, following oral argument, the Court seals corresponding sections of the parties' briefing in the Court of Appeals." Mot. at 1 (emphasis added). As noted, we affirm the Court of Appeals' denial of Dreewes's motion to seal portions of the appellate briefing. Accordingly, we deny Dreewes's current contingent motion to seal limited portions of her answer to amici.

## CONCLUSION

The State's assumed burden in the law of the case context did not apply to the State's burden to prove accomplice liability. We reverse the Court of Appeals and reinstate defendant's conviction for second degree assault with a deadly weapon as an accomplice.

The Court of Appeals properly denied defendant's request to seal portions of the State's response brief and defendant's reply brief that contained information about defendant's financial matters. We affirm the Court of Appeals on this issue.

Finally, we deny Dreewes's Motion To Seal Limited Portions of Answer to Amici

If Court Seals Corresponding Briefing, which was passed to the merits.

_Madsen, J._

WE CONCUR:

_Fairhurst, C.J._

_Johnson, J._

_Owens, J._

_Stephens, J._

_Wiggins, J._

_González, J._

_Gordon McCloud, J._

_Yu, J._