**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

STATE OF WASHINGTON,

                Respondent,

        v.

BRADLEY JOSEPH QUINN,

                Appellant.

No. 86623-1-I

DIVISION ONE

UNPUBLISHED OPINION

MANN, J. — Bradley Quinn appeals his convictions of two counts of assault in the second degree. Quinn argues that insufficient evidence supports the second degree assault convictions. Quinn also argues that the victim penalty assessment (VPA) and DNA collection fee should be stricken from his judgment and sentence. We remand to strike the VPA and DNA collection fee from Quinn's judgment and sentence. We otherwise affirm.

I

On January 19, 2023, the Thurston County Narcotics Task Force (Task Force) executed an operation to locate and apprehend Quinn based on a warrant for his arrest.[1]

---

[1] The Task Force is comprised of multiple officers from different law enforcement agencies. The Task Force primarily investigates mid- to upper-level drug traffickers but they assist other agencies in the county. The request for assistance locating Quinn came from both the Olympia Police Department and the Department of Corrections.

The Task Force reviewed photographs of Quinn and believed that he was staying at the College Glen Apartments in Lacey, Washington. Quinn was also associated with a white 2011 Ford Escape that was reported stolen. The Task Force began surveillance at the College Glen Apartments around 10:00 a.m. They located a black Honda Civic registered to Quinn and a white 2011 Ford Escape, which had no license plates. The VIN number of the Ford Escape, typically visible from the front of a vehicle, was covered with a piece of paper.

About one hour into surveillance, members of the Task Force saw Quinn walk out of the apartment building. Quinn looked out at the parking lot and appeared nervous "like he was looking for if somebody was watching him." Detective Jordan Goss drove past Quinn in order to positively identify him. Quinn "immediately moved both hands up and covered his face" and stared at Goss as he drove by.

Quinn returned to the apartment. Roughly 15 minutes later, someone came out of the same building wearing slightly different clothes and a mask covering part of their face. Officers identified the person as Quinn. Quinn first walked up to the black Honda Civic but then quickly went over to the white Ford Escape, unlocked it, and got in the driver's seat.

Detective Tyson Shenkel, who was wearing his marked police vest,[2] walked toward Quinn to contact him. But Quinn quickly drove out of the parking space. Quinn came around a corner toward Shenkel, slowed down, and made eye contact with him.

---

[2] The vest has the sheriff's badge in the top corner and says "police" in large bold letters across the front and the back. Each member of the Task Force has a vest marked with the agency they come from. Because of the nature of their work, members of the Task Force wear plain clothes and drive unmarked vehicles.

Shenkel repeatedly yelled commands at Quinn, announcing himself as law enforcement and telling Quinn to stop. But Quinn accelerated "very hard" speeding into a cul-de-sac.

Specialist John Tulloch attempted a maneuver to block Quinn from exiting the cul-de-sac and reversed his truck to block the west exit, however, this placed the side of his truck in the path of Quinn's vehicle. Quinn collided into Tulloch's rear passenger side panel resulting in a large impact that spun Tulloch's vehicle around. Quinn made no attempts to slow or stop his vehicle before hitting Tulloch.

Quinn turned left out of the cul-de-sac, and continued driving toward the exit of the apartment complex at a high rate of speed. Goss and Special Agent Gabriel Stajduhar approached Quinn's position from separate vehicles. The emergency lights on Stajduhar's vehicle were activated. Stajduhar saw Quinn's vehicle headed directly toward him, braked, and pushed his head back as far as he could into his seat because he thought Quinn was going to hit him head on and he did not want the airbag to hit his face. But just before impact, Quinn veered to the right, narrowly missing Stajduhar's vehicle.

Goss was just behind and to the right of Stajduhar. Goss realized Quinn's vehicle was driving directly at him and it was "accelerating faster and faster." Goss stopped his vehicle and "hop[ed] nothing bad was going to happen." Goss did the only thing he could to try to lessen the impact and turned his steering wheel, attempting to get out of the way of Quinn. Quinn collided with Goss's front driver's side, near the headlight. Goss expected air bag deployment and turned his head right, and he felt his vehicle "lurch backwards."

Quinn's vehicle crashed into the corner of a garage but was still operational. Quinn exited the apartment complex, now driving in the opposite lanes of traffic, and more police vehicles joined the pursuit. Quinn abandoned the Ford Escape, fleeing on foot, but, ultimately, Quinn was apprehended. Throughout, Quinn's driving was "erratic," the car was "swerving back and forth," and he was accelerating, possibly reaching speeds of around 25 to 30 and 35 to 40 miles per hour in the apartment parking lot.

The State charged Quinn with two counts of assault in the second degree, attempting to elude a pursuing police vehicle, possession of a stolen motor vehicle, two counts of malicious mischief in the first degree, two counts of hit and run attended vehicle, hit and run property damage, and resisting arrest.

The jury found Quinn guilty on all counts.

Quinn appeals.[3]

II

Quinn argues that the State failed to present sufficient evidence that Quinn intended to assault Tulloch or Goss with a deadly weapon. We disagree.

Evidence is sufficient to support a conviction, if, viewing the evidence in the light most favorable to the State, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. State v. Dreewes, 192 Wn.2d 812, 821, 432 P.3d 795 (2019). "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." State v. Salinas, 119

_____

[3] Quinn challenges his convictions only for assault in the second degree.

Wn.2d 192, 201, 829 P.2d 1068 (1992). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201.

Circumstantial and direct evidence are equally reliable. State v. Cardenas-Flores, 189 Wn.2d 243, 266, 401 P.3d 19 (2017). We defer to the fact finder's resolution of conflicting testimony and evaluation of the evidence's persuasiveness. State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014). Specific criminal intent can be inferred from conduct that plainly indicates such intent as a matter of logical probability. State v. Abuan, 161 Wn. App. 135, 155, 257 P.3d 1 (2011).

Washington courts use the common law definition of assault, which includes three ways to commit an assault: "(1) an unlawful touching (actual battery); (2) an attempt with unlawful force to inflict bodily injury upon another, tending but failing to accomplish it (attempted battery); and (3) putting another in apprehension of harm." State v. Elmi, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). RCW 9A.08.010(1)(a) provides that "[a] person acts with intent or intentionally when he or she acts with the objective purpose to accomplish a result which constitutes a crime."

Here, the trial court instructed the jury that to convict Quinn of second degree assault as alleged in count 1, the State had to prove that on or about January 19, 2023, Quinn assaulted Tulloch with a deadly weapon and this act occurred in the State of Washington. And, as alleged in count 2, the State had to prove that on or about January 19, 2023, Quinn assaulted Goss with a deadly weapon and this act occurred in the State of Washington. The trial court also instructed the jury on all three ways to commit an assault.

Quinn first asserts that he did not know he was being arrested or apprehended when the vehicles tried to stop him from leaving the apartment complex. But, at trial, the State presented evidence that Quinn knew there was a warrant out for his arrest and that he was in possession of a stolen vehicle.[4] While Quinn asserts that the officers were in unmarked vehicles, each was wearing their tactical, marked law enforcement vest. Shenkel testified that he was out of his vehicle, wearing his marked vest, made eye contact with Quinn, and loudly and repeatedly announced himself as law enforcement and instructed Quinn to stop. This was witnessed by other officers on the scene. Stajduhar had activated his police lights before driving toward Quinn and Quinn had to swerve quickly to avoid hitting him. From this evidence, the jury could infer that Quinn knew the people attempting to stop him were law enforcement effectuating an arrest.

Second, Quinn asserts that both collisions were caused by law enforcement and in neither instance did he intentionally collide with their vehicles. The State presented evidence that Quinn was driving erratically and at high speeds through a residential apartment complex. Even before colliding with Tulloch, Quinn sped through the cul-de-sac, veered into the right-side lane of traffic, and nearly collided with Lieutenant Tim Rudloff. Throughout, Quinn made no attempts to slow his speed or stop. He then slammed into Tulloch's truck.

---

[4] In a jail phone call, Quinn was asked how law enforcement knew about the white 2011 Ford Escape and he said "the thing fell out of the window." Before Quinn's flight from law enforcement, the VIN number of the Ford Escape was covered with a small piece of paper. Viewing this evidence in the light most favorable to the State, Quinn knew that the vehicle was stolen and had attempted to avoid detection by covering the VIN number.

Even after colliding with Tulloch, Quinn continued to accelerate. On a recorded jail phone call, Quinn stated, "I was punching it." Quinn only narrowly missed colliding with Stajduhar's vehicle, whose lights were activated. And if Goss hadn't turned his wheel to the right, Quinn would have hit him head on. Quinn still hit Goss, causing his vehicle to lurch backwards.

Viewing the evidence in the light most favorable to the State, these facts suggest criminal intent as a matter of logical probability. Quinn intentionally hit Tulloch and Goss in an attempt to escape apprehension.

Quinn also asserts that he did not intend to cause apprehension or fear of bodily harm to Tulloch. Quinn cites Abuan, in support. In Abuan, the defendant was convicted of two counts of second degree assault after firing a gun at a person in a garage attached to a house. 161 Wn. App. at 140, 142. The second count was based on a second person within the home who heard the gunshots. Abuan, 161 Wn. App. at 142. The court concluded there was insufficient evidence of Abuan's intent to assault the person inside the house because: (1) the State did not offer a transferred intent jury instruction and (2) there was an "absence of any injury or apprehension and imminent fear of bodily injury" because the person in the house did not have a gun pointed at him, did not see the shooter or the gun, and could not see the shooting. Abuan, 161 Wn. App. at 159.

This case is distinguishable from Abuan because this case deals with the actual battery prong of assault. To prove actual battery, the State must only prove "intent to do the physical act constituting assault." State v. Hall, 104 Wn. App. 56, 62, 14 P.3d 884 (2000). Quinn knew Tulloch tried to block him with his truck, admitting on a jail call that

-7-

he "punched it" to try and get past him. Quinn made no attempt to stop or slow before slamming into the rear passenger portion of Tulloch's truck. The jury could have inferred the necessary intent from this evidence.

We conclude that there was sufficient evidence to prove that Quinn intended to assault Tulloch and Goss with a deadly weapon.

III

Quinn argues that the $500 VPA and $100 DNA collection fee should be stricken from his judgment and sentence.

In 2023, the legislature amended RCW 7.68.035 to prohibit courts from imposing the VPA on indigent defendants as defined in RCW 10.01.160(3); LAWS OF 2023, ch. 449, § 1. In addition, the legislature eliminated the DNA fee entirely. LAWS OF 2023, ch. 449, § 4. Our courts have held that recent amendments to statutes governing legal financial obligations apply retroactively to matters pending on direct appeal. State v. Ellis, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023).

The State does not dispute that Quinn is indigent and concedes that this matter should be remanded to strike the VPA and DNA collection fee from Quinn's judgment and sentence. We accept the State's concession and remand.

We remand to strike the VPA and DNA collection fee from Quinn's judgment and sentence. We otherwise affirm.

Mann, J.

WE CONCUR:

Birk, J.

Chung, J.