**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clientlawareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 81463-0-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| LENDSAY LESHLY MEZA, | ) | |
| | ) | PUBLISHED OPINION |
| Appellant. | ) | |
| | ) | |

MANN, J. — Lendsay Meza was convicted by jury of two counts of first degree murder with firearm enhancements. Meza appeals raising several arguments including that: (1) the trial court erred in applying the privilege against self-incrimination to a witness whose conviction was final; (2) the prosecutor committed misconduct by presenting inadmissible evidence during opening statements; (3) the failure to provide jurors fair compensation deprived her of a constitutionally fair jury trial; (4) the evidence was insufficient to prove she committed felony murder predicated on first degree kidnapping; (5) the prosecution failed to prove beyond a reasonable doubt that one of the victims, Ezekiel Kelly, died as a result of Meza's acts as required in the jury

instructions; (6) the trial court erred in ruling it lacked discretion to grant Meza an exceptional sentence; (7) count 3 must be vacated rather than dismissed; and (8) the trial court erred in applying discretionary supervision fees. We remand for the trial court to strike supervision fees. We vacate the order sealing exhibits and otherwise affirm.

FACTS

Meza and Anthony Hernandez Cano met online in 2016 when Meza was 18 years old. Shortly after, Cano moved from Georgia to Seattle to live with Meza. The pair lived in the Vantage Apartments with Meza's family. Meza and Cano frequently used cocaine, methamphetamine, and prescription medication. Cano and Meza had an abusive relationship which included a no-contact order between them.

A. Mohamed Adan's Death

On June 30, 2018, Cano and Meza attended a quinceañera. Meza drank alcohol, smoked cannabis, and consumed Xanax. After the party, Meza drove Cano, Chris Diaz, and Edwin Valdespino in her car, a red Saturn, back to her apartment. While driving, she stopped when Cano and Diaz saw Hassani Hassani and Mohamed Adan and asked her to stop the car. Hassani was Cano's friend and lived at the Vantage Apartments. Earlier that night, Hassani and Adan had an argument because Hassani caught Adan kissing his girlfriend, Anika St. Mary. Hassani and Adan got into Meza's car and Meza drove the group to the parking lot at the apartment complex where Meza lived. At the parking lot, everyone got out of the car except Diaz and Meza, who recall being in and out of consciousness. After about 30 minutes, everyone got back in the car and Meza drove the group to the parking garage at the apartment complex upon Cano's request. The group went into an apartment garage and Meza

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

saw that Adan had been badly beaten. Thinking the men were "settling a beef," Meza went back to her car and fell asleep. The men then bound and further beat Adan in the garage. Meza testified that she was asleep for the rest of the events, only waking up in Marysville on the way back home where she then went to sleep again.

On July 1, 2018, a neighbor found Adan's body at Blue Stilly Park near Arlington. He was shot seven times. Two bullets penetrated his foot and the other five penetrated his chest and abdomen. There were cigarette like burns on his face, a laceration on his head inflicted by a linear object, such as a baseball bat, and swelling and bruising to his face.

Surveillance cameras showed Meza's red Saturn entering a road leading to Blue Stilly Park at 5:19 a.m. and leaving the park at 5:33 a.m. It returned at 5:38 a.m., and left again at 5:42 a.m. A deleted photograph shows Cano holding a gun outside the car and another photograph shows Cano in the same park with Adan. Police later searched the garage at the Vantage Apartments and found blood stains with DNA that matched Adan. Meza recited many different versions of that night's events, including one where she stated being at home in bed the entire night. Meza eventually admitted she believed the group killed Adan.

Cano similarly gave a lengthy recorded statement of the events. Cano stated he tied up Adan and drove him to Arlington with Meza asleep in the front seat. Cano told Adan to get out of the car and shot him twice in the leg or foot. They then left Adan there, drove away, and came back after approximately 10 minutes. Cano shot Adan in the chest and then the group left a last time.

No. 81463-0-I/4

B. Ezekiel Kelly's Death

Ezekiel Kelly lived with his mother in Everett. Hassani told his friend Vadim Patsula that he was interested in finding Kelly and beating him up because of something to do with his girlfriend, St. Mary. On July 2, 2018, Patsula called Hassani and told him he saw Kelly near a Shell gas station. Meza, claiming to not know why, drove Cano, Hassani, and St. Mary to the gas station. At the gas station, Cano and Hassani got out of the car and returned with Kelly. Cano then told Meza to drive to South County Park. Surveillance footage from the Shell shows Kelly and a red Saturn arriving in the parking lot.

Meza testified that she drove through the back roads and ended up in Edmond but tried swerving the car to get the attention of police along the way. At South County Park, Cano, Hassani, and Meza got out of the car with Kelly. Meza claimed Kelly discussed raping her, so she got mad and hit him twice on the legs with a baseball bat. The group returned to the car and Hassani and Cano started punching Kelly again. Meza then drove the group to an abandoned house where Hassani and Cano forced Kelly out of the car. Cano then told Meza to leave. As she drove away, she claimed to hear a gunshot.

On July 3, 2018, a neighbor found Kelly's body in the carport of an abandoned building. He was stabbed multiple times and shot five times, three times in the head, one to his hand, and one to his knee. Four stab wounds penetrated his right lung and liver. He had also been stabbed in the head with a screwdriver like object. An injury on his head resembled that of a linear object such as a baseball bat.

-4-

No. 81463-0-I/5

C. Conviction and Sentencing

Meza was convicted of three counts of first degree murder. Count 1 was for the felony murder of Adan predicated on first degree kidnapping. Count 2 was for the premeditated murder of Kelly. Each count contained a firearm enhancement. The jury also found Meza guilty of count 3, the felony murder of Kelly. The trial court dismissed the conviction on count 3 finding it merged with count 2. Meza was sentenced to 50 years' confinement.

Meza appeals.

ANALYSIS

A. Privilege Against Self-incrimination

After Meza sought testimony from Cano, Cano refused asserting his Fifth Amendment privilege against self-incrimination. Meza argues that the trial court erred in affirming Cano's right not to testify because Cano pleaded guilty and did not timely appeal his judgment and sentence. Based on the record before us, we disagree.

Criminal defendants have the constitutional right to present a complete defense and to call witnesses to testify. U.S. CONST. amends. VI, XIV; CONST. art. I. § 22; State v. Maupin, 128 Wn.2d 918, 924, 913 P.2d 808 (1996). Washington recognizes an obligation of a witness to testify. State v. Parker, 79 Wn.2d 326, 331, 485 P.2d 60 (1971). A witness called to testify may, however, claim the Fifth Amendment privilege against self-incrimination. U.S. CONST. amends. V, XIV; CONST. art. I, § 9. The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." This privilege includes the right of a witness not to give

-5-

No. 81463-0-I/6

incriminating answers in any proceeding. <u>Kastigar v. United States</u>, 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972).

"'[T]he power to decide whether the hazards of self-incrimination are genuine and not merely illusory, speculative, contrived or false, must rest with the trial court before whom the witness is called to give evidence.'" <u>State v. Hobble</u>, 126 Wn.2d 283, 291, 892 P.2d 85 (1995) (quoting <u>Parker</u>, 79 Wn.2d at 332).  "The determination whether the privilege applies lies within the sound discretion of the trial court under all the circumstances then present." <u>Hobble</u>, 126 Wn.2d at 291.  Whether a privilege is available, however, is a question of law that we review de novo.  See <u>In re Pers. Restraint of Cross</u>, 180 Wn.2d 664, 681 n.7, 327 P.3d 660 (2014) (clarifying that in reviewing Fifth Amendment issues, appellate courts defer to unchallenged findings of fact but review legal conclusions de novo), <u>abrogated by</u> <u>State v. Gregory</u>, 192 Wn.2d 1, 427 P.3d 621 (2018).

Meza sought to call Cano to testify as a witness.  Cano previously pleaded guilty to two counts of aggravated first degree murder in the homicides of Adan and Kelly. Cano received a life sentence.  He did not appeal the judgment and sentence. However, Cano filed a timely personal restraint petition (PRP) seeking to vacate or withdraw his guilty plea.  In determining whether Cano should retain the privilege, defense counsel questioned Cano outside the presence of the jury.  The topics of inquiry included the party on June 30, the use of alcohol and drugs at the party, Meza's use of alcohol and drugs at the party, Cano's opinion of Meza's intoxication, driving of the car on the days in question, and the photos on Meza's phone.  Cano asserted his Fifth Amendment right not to testify for each question.

-6-

No. 81463-0-I/7

The trial court reviewed Cano's motion to withdraw his guilty plea and heard argument from counsel, including Cano's counsel. Cano's counsel pointed out that Cano pleaded guilty to aggravated murder and life in prison thereby preventing the State from seeking the death penalty. But in the interim, our Supreme Court had ruled the death penalty unconstitutional, raising the question whether Cano would have pleaded differently. Gregory, 192 Wn.2d at 1. The prosecutor reluctantly agreed that the subsequent abolishment of the death penalty was of concern.

The trial court upheld Cano's privilege against self-incrimination because he was attacking his guilty plea with a PRP:

> I'll find that, because there's a current personal restraint petition pending where the defendant is seeking to, as part of the relief, vacate or withdraw the guilty plea that he entered in this case, I'll find that he is in jeopardy in relation to the response to these questions. I will allow him to assert the privilege. I'll find that he is unavailable as a witness related to these issues.

The court also explained that if Cano did not have a pending PRP, Cano would not have retained the privilege:

> It's because I find, that, at this point, because he has that pending action to withdraw his plea that he has potential jeopardy to him associated to that. But if he had not brought that action, I would have not have allowed him to assert the privilege.

We must first decide whether a privilege was available to Cano. As a general rule, "once a person is convicted of a crime, he no longer has the privilege against self-incrimination as he can no longer be incriminated by his testimony about said crime." Reina v. United States, 364 U.S. 507, 513, 81 S. Ct. 260, 5 L. Ed. 2d 249 (1960); State v. Ruiz, 176 Wn. App. 623, 636, 309 P.3d 700 (2013). The law is less clear on the effect of a postconviction collateral attack such as a PRP.

-7-

No. 81463-0-I/8

Relying in part on Ruiz, Meza urges a bright line rule that the privilege no longer exists after the deadline for an appeal of the original judgment and sentence. In Ruiz, Division Three of this court stated: "When a person has been convicted of a crime and there is no longer any possibility of appeal, the Fifth Amendment privilege no longer exists because there is no potential jeopardy for testifying." Ruiz, 176 Wn. App. at 636. Because Cano did not appeal his original judgment and sentence, Meza contends that Cano's privilege against self-incrimination no longer exists. We disagree with Meza's overly narrow reading of Ruiz.

Indeed, the next sentence in the opinion, citing McCormick on Evidence, recognizes "absent some specific showing that collateral attack is likely to succeed, most courts treat finality of conviction as unqualifiedly removing the risk of discrimination." Ruiz, 176 Wn. App. at 636 (citing 1 MCCORMICK ON EVIDENCE § 121, at 527 (Kenneth S. Broun ed., 6th ed. 2006)).

Moreover, the McCormick article cited in Ruiz bases its concern, in part, on the idea that allowing a collateral attack to extend the privilege would greatly expand the privilege:

> Collateral attack is generally available at any time, so regarding the risk of retrial after a successful attack of this sort as preserving protection would dramatically expand the protection of the privilege. The best solution is to treat the possibility of successful collateral attack and retrial as raising the question of whether the facts present a "real and appreciable" danger of incrimination. In the absence of some specific showing that collateral attack is likely to be successful, a conviction should be regarded as removing the risk of incrimination and consequently the protection of the privilege. Most courts, however, treat the finality of a conviction as unqualifiedly removing the risk of incrimination.

1 MCCORMICK ON EVIDENCE § 121, at 799 (Robert P. Mosteller ed., 8th ed. 2020).

No. 81463-0-I/9

This concern, however, is at least partially eliminated in Washington by the legislature's decision limiting most collateral attacks to one year. RCW 10.73.090(1). We hold instead that where a collateral attack, such as a PRP, has been timely filed, and the petition objectively gives rise to a good faith argument for postconviction relief, that the privilege against self-incrimination extends.

Based on the record before us, at the time he invoked his Fifth Amendment right against self-incrimination, Cano had a timely PRP pending before this court. Based on the argument of counsel, Cano pleaded guilty to aggravated murder and received a life sentence, thus avoided a possible death sentence. Postconviction, however, our Supreme Court held the death penalty unconstitutional. Gregory, 192 Wn.2d at 1. This change in circumstances raised at least a question of whether Cano would have pleaded differently if the death penalty had not been a possibility. Cano's timely petition for review objectively gave rise to a good faith claim for relief and his privilege existed.

Because the trial court found that Cano's testimony at Meza's trial put him at jeopardy of self-incrimination in the event Cano's PRP was successful, and he was allowed to withdraw his guilty plea, the trial court did not abuse its discretion.

B. Prosecutorial Misconduct

Meza next argues that the prosecutor committed misconduct by presenting evidence during opening statements that was unfairly prejudicial. We disagree.

A trial court may grant a new trial "when it affirmatively appears that a substantial right of the defendant was materially affected . . . [by m]isconduct of the prosecution." CrR 7.5(a)(2). We review for abuse of discretion the trial court's order denying a new

No. 81463-0-I/10

trial based on prosecutorial misconduct.  State v. Dawkins, 71 Wn. App. 902, 906, 863 P.2d 124 (1993).

To prevail on a claim of prosecutorial misconduct, the defendant must prove "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'"  State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (quoting State v. Hughes, 118 Wn. App. 713, 727, 77 P.3d 681 (2003)).  To establish prejudice, the defendant must prove that "'there is a substantial likelihood [that] the instances of misconduct affected the jury's verdict.'"  State v. Thorgerson, 172 Wn.2d 438, 443-44, 258 P.3d 43 (2011) (quoting Magers, 164 Wn.2d at 191).  When determining whether prosecutorial misconduct requires reversal, the court must review the statements in the context of the entire case.  State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

The "prosecutor's opening statement may outline the anticipated evidence that counsel has a good faith belief will be produced at trial.  The defendant bears the burden of showing the prosecutor acted without good faith."  State v. Farnsworth, 185 Wn.2d 768, 785-86, 374 P.3d 1152 (2016).  The trial court maintains wide discretion in deciding the good faith of the prosecutor.  State v. Campbell, 103 Wn.2d 1, 16, 691 P.2d 929 (1984).

Pretrial, the trial court considered videos and photos obtained from Meza's cell phone.  One of the photos was a screenshot showing Meza holding what appeared to be a .22 Ruger pointed at the camera with a caption "Yeah am crazy asf BITCH."  The State claimed the videos and photos were created only days after the homicides.  The defense disagreed, arguing that the timing was inaccurate.  The trial court ruled that the

-10-

No. 81463-0-I/11

State would need to lay the foundation for admissibility during trial, but it would allow the photographs and videos during opening statements. Meza objected. The State argued it had a good faith belief it had the foundation necessary to admit the evidence. The court allowed the State to use the evidence but claimed "it could be at their peril" if they were unable to establish the necessary foundation later.

In its introductory instructions, the trial court instructed the jury that lawyers' statements are not evidence or law—the only evidence is the testimony and exhibits. During its opening statement, the State showed the videos to the jury and explained:

> But on the defendant's phone, in addition to the images of Mr. Adan in the backseat along with [Cano], there were three Snapchat videos of about seven or eight seconds in length each, all of a theme. But what was interesting about them is that the video was taken on July 4th of 2018, and we know this because the metadata, the date stamp, is embedded in video.
>
> So two days after the murder of Ezekiel Kelly, three days after the murder of Mohamed Adan, the defendant has what appears to be that .22 Ruger, pointing it at the camera, with the heading underneath it, "Yeah am crazy asf"—as fuck—"bitch." This was created two days after the murder of Kelly and three after the murder of Adan.

After opening statements, defense counsel interviewed Detective James Headrick about the videos. Detective Headrick concluded that the videos were created on June 10th, not July 4th, and could not determine when the caption was created. Meza moved for a mistrial. The court determined a mistrial was unwarranted because opening statements are not considered as evidence. However, the court found the probative value of the caption was substantially outweighed by the danger of unfair prejudice. Therefore, the parties could seek admission of a still photo from the video, but not the caption.

-11-

No. 81463-0-I/12

The videos and photos from Meza's phone were admitted at trial, without the added caption. The videos showed Meza holding a gun against her cheek. She sticks her tongue out, points the gun at the camera, and then pantomimes blowing smoke from the muzzle.

We disagree with Meza's contention that the prosecutor's comments during opening statements were misconduct. First, the State's use of the video and caption in opening remarks was not improper. In opening statements, a prosecutor may present anticipated evidence in good faith. Farnsworth, 185 Wn.2d at 785-86. There is no claim that the State acted in bad faith by discussing the photos and captions in the opening remarks. The court specifically determined the prosecutor had a good faith belief that the photograph would be admitted. And it was in part. Defense counsel also acknowledged that his "remarks about the picture [were] not meant to say that the State has acted in any nefarious way." A good faith presentation of anticipated evidence does not become improper because it was later not introduced.

Meza cites In re Personal Restraint of Glasmann, 175 Wn.2d 696, 286 P.3d 673 (2012), and State v. Pete, 152 Wn.2d 546, 98 P.3d 803 (2004), to support the assertion that it is misconduct to present extrinsic evidence to the jury. These cases are distinguishable as they discuss closing statements and jury deliberations. In closing arguments, it is improper for a prosecutor to refer to matters outside the record developed at trial. Glasmann, 175 Wn.2d at 704-05. At the time of closing arguments and jury deliberations, all the evidence have been introduced. But during opening statements, no evidence had been introduced; therefore the rules surrounding closing arguments and jury deliberations do not apply.

-12-

No. 81463-0-I/13

Second, Meza cannot demonstrate prejudice. The prosecutor's statement referenced a picture and caption at the beginning of the trial. The trial court instructed the jury before the opening statements and before deliberation that the parties opening remarks are not considered evidence. The videos and pictures the State referenced were admitted, just not the caption on the video. The video still showed Meza handling the murder weapon and jokingly pointing it at the camera. It is unlikely that the State's remarks regarding the caption prejudiced Meza; therefore, the trial court did not abuse its discretion in denying the motion for a mistrial.

C. <u>Constitutional Rights of Jurors</u>

Meza argues that the jury expense compensation set by Washington statute violated her constitutional rights. We disagree.

Before jury selection, Meza objected to excusing any juror from service based on economic hardship. Meza argued that economic hardship disproportionately removes traditionally marginalized members of the community. Meza also asked the court to order the State to provide reasonable compensation to any juror who would otherwise be excused for economic hardship. The trial court agreed that jurors are not adequately compensated, but denied Meza's request, stating, "I can't do it," and "[w]e don't have sufficient funds to do it." Meza argues that during jury selection, the court excused eight jurors for economic hardship. That statement is incorrect. Jurors 7, 51, and 65 were excused for true economic hardship. The other five jurors mentioned were excused for a variety of reasons such as anxiety, potential for a poor work performance, job interviews, and lack of childcare.

-13-

No. 81463-0-I/14

1.  Impartial Jury[1]

Meza argues first that excluding individual jurors for economic hardship violated her right to an impartial jury trial with jurors that represent a fair cross-section of the community.

Criminal defendants have a constitutional right to a jury trial. U.S. CONST. amends. VI, XIV; CONST. art I, §§ 21, 22. This includes the right to have a jury drawn from a fair cross-section of the community. Taylor v. Louisiana, 419 U.S. 522, 527, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975).

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Duren v. Missouri, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979).

Excluding jurors based on low economic or social status violates this right, as does any other systematic exclusion of distinctive groups in the community. Thiel v. S. Pac. Co., 328 U.S. 217, 223-24, 66 S. Ct. 984, 90 L. Ed. 1181 (1946); Duren, 439 U.S. at 363-64. But the fair cross-section applies to the selection of the venire, not to the dismissal of individual jurors at the jury panel stage. Holland v. Illinois, 493 U.S. 474, 480, 110 S. Ct. 803, 107 L. Ed. 2d 905 (1990). At the jury panel stage, "jury selection must be done in a fair way that does not exclude qualified jurors on inappropriate grounds." State v. Pierce, 195 Wn.2d 230, 231-32, 455 P.3d 647 (2020).

---

[1] In Meza's reply brief, she explains that the State mischaracterized her claim as a violation of her federal constitutional right to have a jury that represents a fair cross-section of the community. However, considering subsection 3(a) of Meza's opening brief is titled "Defendants have a constitutional right to an impartial jury trial with jurors drawn form a fair cross section of the community," we address the claim.

-14-

No. 81463-0-I/15

Meza's argument fails. First, RCW 2.36.080(3) states that no one is excused from the venire based on economic status. Furthermore, granting an exemption based on hardship is not an exclusion. Rocha v. King County, 195 Wn.2d 412, 428-29, 460 P.3d 624, 632 (2020).

Second, jurors excused for financial hardship do not create a "distinctive group." The heart of a fair-cross-section claim is the systematic exclusion of a "distinctive group" in the community, such as people of color, women, or Mexican-Americans, for reasons completely unrelated to the ability of members of the group to serve as jurors in a particular case. Lockhart v. McCree, 476 U.S. 162, 175, 90 L. Ed. 2d 137 (1986). The Arizona Supreme court held that persons excused because of hardship are not a "cognizable group," and other courts agree. State v. Atwood, 171 Ariz. 576, 622, 832 P.2d 593 (1992); People v. Tafoya, 42 Cal. 4th 147, 169, 164 P.3d 590, 64 Cal. Rptr. 3d 163, 187 (2007); Atwood v. Schriro, 489 F. Supp. 2d 982, 1046 (D. Ariz. 2007); Coleman v. McCormick, 874 F.2d 1280, 1284 (9th Cir. 1989); People v. Reese, 670 P.2d 11, 14 (Colo. App. 1983). Because the dismissed jurors are not a distinctive group, Meza fails the first step of the Duren test.

In Thiel, the Supreme Court held that the practice of excluding from jury lists all persons who worked for a daily wage violated jury selection statutes. 328 U.S. at 222-23. However, the court stated, "a federal judge would be justified in excusing a daily wage earner for whom jury service would entail an undue financial hardship. But that fact cannot support the complete exclusion of all daily wage earners." Thiel, 328 U.S. at 224. Washington follows Thiel. Prospective jurors cannot be systematically excluded on account of economic status, but individual jurors may be excused on a specific

-15-

No. 81463-0-I/16

showing of undue hardship.  RCW 2.36.080(3); RCW 2.36.100(1).  This system,

therefore, does not deprive criminal defendants of their right to a jury trial.

 2.  Equal Protection Clause

 Meza argues next that the $10 dollar per day juror compensation rate violates

equal protection because jury service is a fundamental right, and the low compensation

restrains this right.

  Washington statute instructs counties to set juror compensation at $10 to $25

per day.  RCW 2.36.150.  "Equal protection under the law is required by both the

Fourteenth Amendment to the United States Constitution and article I, section 12 of the

Washington Constitution.  Equal protection requires that all persons similarly situated

should be treated alike."  Am. Legion Post #149 v. Wash. State Dep't of Health, 164

Wn.2d 570, 608-09, 192 P.3d 306 (2008).  Under the equal protection clause, strict

scrutiny applies to laws burdening fundamental rights or liberties, otherwise, rational

basis review applies.  Am. Legion, 164 Wn.2d at 608-09.  A law passes rational basis

review if it bears a rational relation to some legitimate end.  Am. Legion, 164 Wn.2d at

608-09.

 Meza argues that the ability to serve on a jury is a fundamental right.  However,

in State v. Marsh, 106 Wn. App. 801, 808-09, 24 P.3d 1127 (2001), this court held that

"eligibility for jury service is not a fundamental right protected by the constitution."  It

went on to apply rational basis review to an equal protection claim surrounding jury

service.  Marsh, 106 Wn. App. at 809.  Here, the Washington jury statutes do not

discriminate on the basis of wealth.  They prevent excluding anyone from jury service

because of economic or social status.  RCW 2.36.080(3).  Every juror receives the

-16-

No. 81463-0-I/17

same compensation.  Simply, statues that treat all persons equally do not invoke an equal protection claim.

    3.   Privileges and Immunities Clause

Meza argues that the juror compensation of $10 per day results in the systematic excusal of jurors based on lack of financial resources, therefore violating the state constitutional prohibition against special privileges and immunities.

The Washington Constitution prohibits special privileges and immunities: "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."  That provision was "intended to prevent favoritism and special treatment for a few to the disadvantage of others."  Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc., 196 Wn.2d 506, 518, 475 P.3d 164 (2020); CONST. art. I, § 12.  Article I, section 12 "is more protective than the federal equal protection clause and in certain situations, requires an independent analysis."  Martinez-Cuevas, 196 Wn.2d at 518.  An analysis is warranted "where a law implicates a privilege or immunity." Martinez-Cuevas, 196 Wn.2d at 518.  If it does, we ask whether there is a reasonable ground for granting that privilege or immunity.  Martinez-Cuevas, 196 Wn.2d at 519. This analysis is only triggered by benefits that implicate a fundamental right of state citizenship.  Martinez-Cuevas, 196 Wn.2d at 519.  If these two requirements are satisfied, "the court will scrutinize the legislative distinction to determine whether it in fact serves the legislature's stated goal."  Martinez-Cuevas, 196 Wn.2d at 523.

Meza's argument fails.  First, eligibility for jury service is not a fundamental right. Marsh, 106 Wn. App. at 808.  Second, while low compensation may make it difficult for

-17-

No. 81463-0-I/18

some to serve on the jury, these statutes do not create any favoritism or special treatment. All jurors are entitled to serve and are selected for venire regardless of economic or social status. RCW 2.36.080(3). And all jurors receive the same payment for service. RCW 2.36.150. Thus, we conclude the juror compensation statute does not implicate the privileges and immunities clause.

D. Sufficiency of Evidence

Meza argues that the State failed to prove that Adan was killed in the course of or in furtherance of kidnapping. Because this was an essential element to count 1, the conviction must be reversed. We disagree.

Due process requires the State to prove all elements of the offense beyond a reasonable doubt. In re Winship, 397 U.S. 358, 368, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); U.S. CONST. amend. XIV; CONST. art. I, § 3. Under an insufficiency of the evidence claim, the court determines whether, "after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992); see also Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

Meza was convicted of the first degree felony murder of Adan, predicated on the felony of first degree kidnapping. To prove the offense, the State carried the burden of showing that "the defendant or an accomplice caused the death of Mohamed Adan in the course of or in furtherance of [Kidnapping in the First Degree] or in immediate flight from such crime." RCW 9A.32.030(1)(c). The State only needed to prove the "defendant caused a victim's death either in the course of or in furtherance of the

No. 81463-0-I/19

commission of another felony." State v. Bass, 18 Wn. App. 2d 790, 789, 491 P.3d 988 (2021).

Kidnapping is a continuing course of conduct crime. Bass, 18 Wn. App. 2d at 792. The crime of kidnapping continues until the person abducted reaches safety. Bass, 18 Wn. App. 2d at 792. Thus, a killing that occurs before the victim reaches safety is "in the course of" the kidnapping. The Washington Supreme Court determined a homicide is "in furtherance of" a crime "if the homicide [was] within the 'res gestae' of the felony, i.e., if there was a close proximity in terms of time and distance between the felony and the homicide." Bass, 18 Wn. App. 2d at 790 (quoting State v. Leech, 114 Wn.2d 700, 706, 790 P.2d 160 (1990)).

At 5:19 a.m., a camera at a fire station shows the red Saturn traveling on a dead-end road towards Blue Stilly Park, where Adan was shot and killed. A photograph shows Adan outside of the car with Cano and the park's "Discover Pass Required" sign in the background. Cano beat Adan with a baseball bat, shot Adan twice in the leg, and then left him there. Video from the fire station shows the red Saturn leaving the park at 5:33 a.m. At 5:38 a.m., video from the fire station shows the red Saturn returning to the park. A picture shows Cano standing with a gun pointed to the ground, in the same area where Adan's body was found. Cano told police he went back and shot Adan multiple times. Video from the fire station shows the red Saturn leaving the area at 5:43 a.m. for a final time. Meza argues that, because the group left Adan at the park for a period of time before returning and killing him, the kidnapping ended before Adan was killed. Conversely, the State argues that a reasonable jury could conclude that the

-19-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

killing of Adan occurred both "in the course of" and "in furtherance of" the kidnapping. We agree with the State.

First, Adan did not reach a place of safety. Adan was left in a park after being beaten and shot twice in the foot. Adan's abductors left him there for less than 10 minutes before returning to the same place Adan was left and killed him. Any rational trier of fact could determine being left in a park for just 10 minutes after being shot in the foot is not a place of safety. Thus, because a reasonable juror could decide Adan never reached a place of safety before he was killed, his death occurred in the course of the kidnapping.

Further, a reasonable juror could conclude that Adan was still abducted when he was killed. A person is abducted when he is restrained by being held in secret or in a place not likely to be found. RCW 9A.40.010(1). To restrain means "to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his or her liberty." RCW 9A.40.010(6). A person can be abducted in a public setting if it is unlikely that he will be found by persons concerned with his welfare. State v. Stubsjoen, 48 Wn. App. 139, 145, 738 P.2d 306 (1987). Cano drove Adan to a park in the early hours of the morning. A juror could reasonably infer that no one with any intentions to help Adan would likely find him at that time. Especially not in the 10 minutes he was alone. Thus, a reasonable juror could conclude that Adan was killed in the course of kidnapping.

In addition, the jury could conclude that the killing of Adan occurred "in furtherance" of the kidnapping. A killing is "in furtherance of" a crime if there is a close proximity in time and distance. Bass, 18 Wn. App. 2d at 790. Even if the kidnapping

ended when Cano left Adan at the park, because Adan was killed at the same location he was left when kidnapped, and the killing occurred within 10 minutes of the kidnapping, a reasonable jury could conclude the time and location were sufficiently close in time and proximity to render the killing "in furtherance of" the kidnapping.

Meza cites State v. Diebold, 152 Wash. 68, 277 P. 394 (1929), to argue that liability for felony murder ends the moment that the felony is completed. In Diebold, the defendant stole a car, drove around, and stopped for a meal. After eating, he decided to return the car and accidentally struck and killed a pedestrian. There, under the Criminal Code, the court held that the defendant was no longer engaged in committing or withdrawing from the scene of a felony. Diebold, 152 Wash. at 73-74. This case does not establish a rigid requirement. In State v. Ryan, 192 Wash. 160, 73 P.2d 735 (1937), a defendant committed a burglary and then shot an officer around 40 miles away when the police tried to stop him. The court directly rejected the idea that the holding in Diebold created a "definite rule." "Each case must depend upon its own facts and circumstances, and, as a rule, presents a question for the jury." Ryan, 192 Wash. at 166. Thus, under the relevant statute, a reasonable juror could conclude that the killing was so close in time and proximity to the kidnapping that the killing occurred in furtherance of the kidnapping.

Any reasonable juror could conclude that the killing of Adan in count 1 occurred "in the course of "kidnapping because the kidnapping was ongoing, or that the killing occurred "in furtherance of" a kidnapping because the killing occurred close in time and proximity to the kidnapping. We conclude the evidence in count 1 was sufficient.

-21-

No. 81463-0-I/22

E. Jury Instructions

Meza argues that the evidence did not prove that she committed first degree premeditated murder as charged in count 2. We disagree.

The State has the burden of proving all of the elements set out in the to-convict instruction. State v. Dreewes, 192 Wn.2d 812, 432 P.3d 795 (2019). "While the to-convict instruction, 'serves as a yardstick by which the jury measures the evidence to determine guilt,' we do not read the instruction in isolation." State v. Tyler, 191 Wn.2d 205, 216, 422 P.3d 436 (2018) (quoting State v. France, 180 Wn.2d 809, 815, 329 P.3d 864 (2014)).

The to-convict instruction set out the following elements:

(1) That on or about the 2nd day of July, 2018, the defendant or an accomplice acted with intent to cause the death of Ezekiel Kelly;
(2) That the intent to cause the death was premeditated;
(3) That Ezekiel Kelly died as a result of the defendant's acts; and
(4) That any of these acts occurred in the State of Washington.

Meza argues that element 3 requires the State to prove that Meza's personal actions resulted in the victim's death, not as an accomplice.

Criminal liability is the same whether one acts as a principal or as an accomplice. RCW 9A.08.020(1), (2)(c). Accomplice liability is not an element or alternative means of a crime. State v. Teal, 152 Wn.2d 333, 338, 96 P.3d 974 (2004). Although the State need not charge the defendant as an accomplice in order to pursue liability on that basis, the court must properly instruct the jury on accomplice liability. State v. Davenport, 100 Wn.2d 757, 764-65, 675 P.2d 1213 (1984). The court can instruct on accomplice liability either by giving a general accomplice liability instruction, or by

-22-

No. 81463-0-I/23

modifying the "to-convict" instructions to include the language "the defendant or an accomplice." Teal, 152 Wn.2d at 336 n.3.

Meza's argument fails for two reasons. First, the jury received a standard instruction defining accomplice liability:

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.

A defendant can be convicted based on the acts committed by another person when the jury receives a separate instruction on accomplice liability. Teal, 152 Wn.2d at 339. Regardless of the language of the to-convict instruction, the jury can find that the acts were committed by another person, and the defendant was an accomplice to those acts. Dreewes, 192 Wn.2d at 826.

Second, Meza's reading of the to-convict instruction creates a conflict with the other jury instructions. Again, in the charge for first degree murder in count 2, element 3 stated, "the defendant's acts" rather than "the defendant or an accomplice" as element 1 stated. Meza argues that this means, per element 3, the State must prove that Meza's personal acts resulted in Kelly's death. However, this would create a conflict with instruction 22 on accomplice liability, which makes the defendant guilty of a crime committed by an accomplice. Additionally, instruction 18 describing first degree murder states, "he or she causes the death of such person." There is no reference to an accomplice presumptively due to general instruction 22. Thus, Meza's reading that the absence of accomplice language requires acts to be personally carried out by the defendant only, would create conflict between the jury instructions. Jury instructions are

-23-

No. 81463-0-I/24

read as a whole to alleviate misunderstanding, and when done so, there is no conflict or missing elements within the jury instructions. Tyler, 191 Wn.2d at 216-17.

We conclude that the jury was given general instructions of accomplice liability; therefore the State's evidence was sufficient to prove the elements of the to-convict instruction.[2]

F. Sentencing

RCW 9.94A.540(1)(a) establishes the mandatory minimum sentence for first degree murder at 20 years confinement. The standard range on both of Meza's convictions was 240 months to 320 months. RCW 9.94A.510, .515. Serious violent offenses run consecutive. RCW 9.94A.589(b). The State asked the court to impose a 240 month sentence for each conviction to run consecutively. In addition, each conviction included a firearm enhancement of five years to run consecutively. RCW 9.94A.533(3)(a).

1. Exceptional Sentence

Meza argues that the trial court erred in finding it lacked the authority to run the two sentences concurrently through an exceptional sentence. The State concedes the issue but argues the error was harmless because the court explained why it would not grant an exceptional sentence regardless. We agree the trial court erred, but that the error does not require remand because the error was harmless.

The court has authority to impose concurrent sentences for serious violent offenses through an exceptional sentence. State v. Graham, 181 Wn.2d 878, 887, 337

---

[2] The State argues that even if the State did not provide sufficient evidence to prove the to-convict elements of count 2, it could reinstate count 3 for the first degree felony murder of Kelly. We disagree. It is impermissible to conditionally dismiss a count based on double jeopardy and reinstate the count in the event of a successful appeal. State v. Turner, 169 Wn.2d 448, 465, 238 P.2d 461 (2010).

No. 81463-0-I/25

P.3d 319 (2014). The trial court abuses its discretion when "it refuses categorically to impose an exceptional sentence below the standard range under any circumstances." State v. Grayson, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005) (quoting State v. Garcia-Martinez, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997)). Failure to consider an exceptional sentence is reversible error. Grayson, 154 Wn.2d at 342. However, sentencing errors generally do not require remand if the reviewing court would have imposed the same sentence based on proper factors. State v. Jackson, 150 Wn.2d 251, 276, 76 P.3d 217 (2003) (reviewing court overturned one or more aggravating factors but was satisfied the trial court would have imposed the same exceptional sentence).

Here, the trial court stated it did not have the authority to run the two sentences concurrently through an exceptional sentence. However, the court stated, "I would not grant the request for an exceptional sentence below the standard range in this particular case based on the facts and circumstances." The court dedicated five pages to explain why an exceptional sentence was unwarranted in this case. Thus, even though the court erroneously found it could not consider an exceptional sentence, the record is clear that the trial court considered the special facts and circumstances of this case and would have rejected the request regardless of error.

### 2. Youth as a Mitigating Factor

Meza argues that the trial court failed to meaningfully consider her request for an exceptional sentence because consecutive sentences are excessive, and her youth was a mitigating factor. We disagree.

-25-

No. 81463-0-I/26

Article I, section 14 of the Washington Constitution prohibits cruel and unusual punishment, including additional protections for the sentencing of young people. CONST. art. I, § 14; In re Pers. Restraint of Monschke, 197 Wn.2d 305, 311 n.6, 482 P.3d 276 (2021).  It is constitutionally impermissible to impose life sentences without parole on persons who committed crimes under the age of 18.  Miller v. Alabama, 567 U.S. 460, 472, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).  Also, when a person is younger than 18, "[t]rial courts must consider mitigating qualities of youth at sentencing" and have complete discretion to impose a sentence below what would otherwise be a mandatory range or sentencing enhancement.  State v. Houston-Sconiers, 188 Wn.2d 1, 21, 391 P.3d 409 (2017).  The Washington Supreme Court recently extended the Miller principles to young adults who were 19-and 20-years-old at the time of their offenses.  Monschke, 197 Wn.2d at 311.  Additionally, a minimum sentence of 46 years constitutes a de facto life sentence.  State v. Haag, 198 Wn.2d 309, 327, 495 P.3d 241 (2021).

Meza was sentenced to 50 years' confinement without the possibility of parole. Under Haag, this is a de facto life sentence.  Meza argues that the Monschke youthfulness principles should be extended to her, as she recently turned 21 at the time of the murders.  Conversely, the State argues that the Monschke court only extended the mitigation of youthfulness to 19-and 20-year-old offenders, and that youthfulness should not extend to 21-year-olds.  However, the State misunderstands Monschke. While that court applied youthfulness as a mitigating factor to a 20-year-old, it also emphasized youthfulness should not be a bright line rule.  Monschke, 197 Wn.2d at 317, 319.  Our Supreme Court held:

-26-

No. 81463-0-I/27

> Sentencing courts must have discretion to take the mitigating qualities of youth—those qualities emphasized in Miller and Houston-Sconiers—into account for defendants younger and older than 18. Not every 19- and 20-year-old will exhibit these mitigating characteristics, just as not every 17-year-old will. We leave it up to sentencing courts to determine which individual defendants merit leniency for these characteristics.

Monschke, 197 Wn.2d at 326. Therefore, while Monschke did not specifically extend mitigation for youthfulness to 21-year-olds, the opinion is clear that there is no bright line rule, and that it is up to the discretion of the sentencing judge to apply youthfulness principles on a case by case basis.

In this case, the sentencing court explained over five pages as to why an exceptional sentence under the standard range was unwarranted based on the facts and circumstances. In response to defense counsel's inquiry, the court also considered the defendant's age as a mitigating factor:

> I have considered it. And I'll say, in relation to this group of people that were involved in this incident, she was the most mature one. She's the one that had a job, she obviously had means of financial support. She did not come across to the Court as somebody being immature. Apparently, at least to this Court, it appeared she had the ability to care for herself. She had a vehicle, she drove. The claim in the statements, I think, part of the trial were somehow she might have some cognitive issues. I think at least that might have been raised. At least from this Court's perspective that did not come across during her testimony in this case. So I did take that into consideration, but I'm not going to give an exceptional sentence down based on her age.

The trial court considered various hallmark features of youthfulness including Meza's environment, financial situation, peer pressures, and extent she was involved in the crime. The grant of an exceptional sentence is in the discretion of the trial judge. State v. Graham, 181 Wn.2d 878, 884 337 P.3d 319 (2014). The trial judge analyzed the facts and circumstances of this case, and specifically addressed youthfulness. We

-27-

No. 81463-0-I/28

conclude the trial court did not abuse its discretion in denying Meza's request for an exceptional sentence.

G. Double Jeopardy

Meza argues that the trial court improperly dismissed, rather than vacated, count 3 for sentencing purposes. We disagree.

The jury found Meza guilty of first degree murder of the same person in counts 2 and 3. At sentencing, the court acknowledged that the two counts merged and dismissed count 3. For the first time on appeal, Meza argues that count 3 should have been vacated rather than dismissed.

For a constitutional issue to be raised for the first time on appeal, it must involve "manifest error." RAP 2.5(a)(3). Thus, the error must have "practical and identifiable consequences." State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). The error here is of constitutional magnitude. Both the federal and state constitutions protect persons from being twice put in jeopardy for the same offense. U.S. CONST. amend. V; CONST. art. I, § 9. However, Meza failed to articulate how the proposed error is manifest. There is no distinguishable consequence for a count being dismissed rather than vacated. Thus, we need not reach the issue on appeal.

Regardless, there is no support for the notion that a conviction must be vacated rather than dismissed per double jeopardy concerns. Notably, the Washington Supreme Court has used the terms vacating and dismissing a conviction interchangeably. See, e.g., State v. Muhammad, 194 Wn.2d 577, 616, 451 P.3d 1060 (2019).

No. 81463-0-I/29

H. Supervision Fees

Meza argues that remand is necessary after the court improperly imposed nonmandatory supervision fees after agreeing to waive all nonmandatory fees due to her indigency. The State argues that, because the judgment and sentence nonetheless requires Meza to pay supervision fees, this court should not follow the court's oral judgment, but maintain that of the written judgment. We agree with Meza and remand to strike supervision fees.

Meza is indigent. The prosecution asked the court to waive all nonmandatory fees and the court granted the request. However, the judgment and sentence orders Meza to "pay supervision fees as determined by [Department of Corrections]."

The relevant statute states, "unless waived by the court . . . the court shall order an offender to . . . [p]ay supervision fees as determined by the department." RCW 9.94A.703(2)(d). We have previously reversed supervision fees where it appears they were inadvertently imposed based on the trial court's oral ruling. State v. Dillion, 12 Wn. App. 2d 133, 152, 456 P.2d 1199 (2020). We recognize that Division Two of this court has determined that the trial court's oral opinion cannot be used to overturn its written judgment. State v. Starr, 16 Wn. App. 2d 106, 109-10, 479 P.3d 1209 (2021).[3] To remain consistent with Dillion, because it appears that it was the trial court's intention to waive all discretionary costs, we remand to strike the requirement that Meza pay supervision fees. 12 Wn. App. 2d at 152.

---

[3] The Supreme Court recently granted review in State v. Bowman, 198 Wn.2d 609, 498 P.3d 478 (2021).

-29-

No. 81463-0-I/30

I. Motion to Seal

The State argues that because the trial court granted an order sealing various exhibits of the victim's bodies, the Court of Appeals should seal the exhibits as well. Meza argues that the trial court exceeded its authority in sealing the exhibits because the appellate court already accepted the case for review. We agree that the trial court exceeded its authority.

During Meza's trial, the State introduced photos depicting the bodies of the decedents without limitation. Two weeks after the trial, on December 6, 2021, the trial court granted the State's motion to seal exhibits 13 through 15, 30, 32 through 54, 70, 71, 86, 87, 90, and 94 through 143. The trial court determined sealing the exhibits was necessary to protect the deceased privacy rights and because there was no substantial public interest in viewing the exhibits.

Under GR 15(g), records that were sealed in the trial court should be sealed from public access in the appellate court, subject to further order of that court. Under RAP 7.2(a), "After review is accepted by the appellate court, the trial court has authority to act in a case only to the extent provided in this rule, unless the appellate court limits or expands that authority as provided in rule 8.3." RAP 7.2(e) provides that "[t]he trial court has authority to hear and determine (1) postjudgment motions authorized by the civil rules, the criminal rules, or statutes, and (2) actions to change or modify a decision that is subject to modification by the court that initially made the decision."

In its motion, the State argued that under GR 15(g) the appellate court should seal the exhibits following the trial court's sealing of the exhibits. However, the trial court exceeded its authority. Rule 7.2 only allows the trial court to enter postjudgment

-30-

No. 81463-0-I/31

motions authorized by "civil rules, the criminal rules, or statutes" but these rules do not authorize a postjudgment motion to seal. Additionally, the trial court's order is not a modification or change to a previous decision. Therefore, because the trial court did not have the authority, the order violates RAP 7.2 and should be vacated. See In re Det. of G.D., 11 Wn. App. 2d 67, 72, 450 P.3d 668 (2019). The State's motion relied on GR 15(g), which does not apply in the absence of a valid order. Thus, we deny the State's motion to seal and vacate the trial court order sealing the exhibits.

We remand for the trial court to strike supervision fees. We vacate the order sealing exhibits and otherwise affirm.

_Mann, J._

WE CONCUR:

_Smith, A.C.J._                     _Dwyer, J._